## AARON E. EMMONS vs. WESTFIELD BANK & another.

By an agreement between E. and H., who was his insolvent debtor, stipulated to terminate at the end of one year, "at which time a settlement shall be made by the parties," but annually renewed for four years successively, E. appointed H. to be his "attorney and agent" to buy, sell and manufacture skins and for that purpose use funds which E. agreed to furnish; and H. agreed to give his whole time and attention to the business and keep accounts of it; and both agreed "that in adjusting the profits and loss E. shall take back in cash all such sums as he may have advanced, with a profit of ten per cent. on such sums, and next, after paying all expenses and claims accrued in the prosecution of said business by said agency, the balance remaining, whether in cash or merchandise, shall belong to H., and H. shall have no right to claim any other pay for his services," "and what belongs to H. as above, or a sufficient amount thereof, shall go to E. towards liquidating his debt against H." *Held*, that this agreement created between E. and H. the relation of principal and agent, and not a partnership, and that in skins bought under it with E.'s funds H. had no interest attachable by his creditors, unless the agreement was fraudulent on the part of both of them.

*Held also*, that neither H.'s possession and control of the property in use under the agreement; nor an understanding between H. and E. that H. should have a living for himself and his family out of the business; nor the appropriation by H., without keeping any account thereof, of a sum sufficient for the support of himself and his family, out of its proceeds; nor the omission by the parties for four years to make any schedule or appraisal of the property on hand or keep accounts of receipts and expenses of the business; nor the fact that at the time of the agreement E. knew that H. was insolvent, were *prima facie* evidence of fraud, that is, such evidence as, standing alone and unexplained, would maintain the proposition and warrant the conclusion to support which it was introduced.

*Held also*, that to show that the agreement was in fraud of H.'s creditors, evidence of prior or contemporaneous fraudulent declarations and acts by him, since his insolvency, was competent: such as what he said to a constable, who had served a writ upon him, concerning transfers of his property to avoid attachment; and his exhibition of several thousand dollars in gold and bank notes, and his statement that he owned them, to one from whom he was trying to borrow money on a mortgage: and also evidence of any of his declarations made or acts done with E.'s permission, tending to show that he treated as his own, property in use under the agreement.

*Held further*, that to contradict testimony of H. that certain property in use under the agreement was property of E., evidence was competent of any acts or declarations of H. tending to show that either the property in question or any other property embraced in the agreement was his own: such as evidence of the style of living of himself and his family while supported out of the business; and of his payment of the expenses of other people's lawsuits, out of such property.

Evidence that a witness on a certain occasion said that certain property belonged to a certain person, has no tendency to contradict his testimony that on a previous occasion he said that it belonged to another person.

On the question of damages in an action against a deputy sheriff for unlawful conversion of goods attached during manufacture, evidence is competent of how much it would cost to complete them for market.

TORT for the conversion of three hundred and twenty-five carpincho skins.

At the trial in the superior court, before *Vose,* J., it appeared that the Westfield Bank recovered judgment against Levi Holcomb of Granby, Connecticut, in an action in the superior court for Hampden, on a promissory note of Holcomb dated September 10, 1860; and that these skins, having been attached on the writ in that action, in December 1864, as Holcomb's property, were sold, in 1865, for four hundred and thirty-seven dollars and fifty cents, in partial satisfaction of the execution, by Timothy M. Cooley, a deputy sheriff for that county, who was joined as a defendant; which was the conversion alleged to be unlawful.

Both the plaintiff and Holcomb were examined as witnesses for the purpose of proving the plaintiff's ownership of these skins at the time of the attachment and sale; and it appeared from their testimony that in 1859 Holcomb, being then insolvent, entered into an oral agreement with the plaintiff, who was a stranger to him, but was one of his creditors, to the effect that the plaintiff should supply him with money for the purchase of skins with which he might continue the business of tanning in Granby, and that the profits of the business should be applied towards extinguishing his indebtedness to the plaintiff; that this arrangement continued until February 1861, when Holcomb, being embarrassed by the attachment, in suits against himself, of stock so purchased with the plaintiff's money, proposed to substitute his son Edwin in his stead, in order to avoid that difficulty, to which substitution the plaintiff agreed, and Holcomb afterwards worked for his son, on wages, until November 4, 1861, when an instrument in writing was executed by him and the plaintiff; that Holcomb, at that time, owed the plaintiff about eighteen hundred dollars; and that from that time to the time of the attachment in December 1864, " he devoted himself to the business of the plaintiff under said contract, as he had theretofore done under the first parol contract with the plaintiff."

This instrument was introduced in evidence, and the parts of it which are material are as follows:

" Know all men by these presents, that I, Aaron E. Emmons, have made and appointed Lewis Holcomb my lawful and proper attorney and agent, and do hereby fully authorize and empower him in my name and behalf to bargain, buy and sell, and to manufacture deer, sheep, goat, calf and other skins, and all necessary materials to manufacture the same, and to use all funds that may be from time to time by me placed in his hands for such purposes; and also to use said funds to rent suitable shops to manufacture and sell the same in and to pay for necessary help or labor on the same."

" And I, the said Aaron E. Emmons, agree with the said Holcomb to furnish him with such sum or sums in cash as he shall from time to time want for the purposes above stated, to be advanced in such sums and at such times as the successful prosecution of the business herein set forth may require ; but in no case shall the whole sum so advanced exceed the sum of two thousand dollars unless by further agreement."

" And I, the said Lewis Holcomb, agree with the said Emmons to devote my whole time and attention to the faithful prosecution of the business as is above set forth, during the whole time of this agreement, and to faithfully apply the said funds that may be intrusted to me to their proper object, and also to keep a just and true account of all matters thereto belonging."

" And it is further agreed by the contracting parties to continue this agreement in full force for the term of one year from the date hereof, when this shall terminate, and at which time a settlement shall be made by the parties."

" And it is agreed that in adjusting the profits and loss the said Emmons shall take back in cash all such sums as he may have advanced, with a profit of ten per cent. on such sums, and next, after paying all expenses and claims accrued by the prosecution of said business by said agency, the balance remaining, whether in cash, goods or merchandise, shall belong to the said Holcomb ; and the said Holcomb shall have no right to claim any other pay for his services."

" And it is further agreed by the parties that what belongs to

said Holcomb as above shall go to the said Emmons towards liquidating his debt against the said Holcomb, or a sufficient amount of it to pay said indebtedness."

It appeared by indorsements·signed by the parties, and dated on November 4 of four successive years, that the contract was renewed yearly, the last indorsed renewal expiring November 4, 1866.

Holcomb testified that under and in pursuance of this contract he purchased for and by order of the plaintiff a thousand carpincho skins and paid for them by the plaintiff's check, and was engaged in tanning them; and that he sent three hundred and twenty-five of them to one Kellogg in Southwick, Massachusetts, to be fulled. It appeared that these skins were attached by the defendant Cooley while they were at Kellogg's fulling mill; and there was evidence by the teamster, named Wells, who took them in two lots from Granby to Southwick, that at the time he delivered the second lot he saw Cooley at Kellogg's mill and told him that the skins belonged to the plaintiff. Wells, on cross-examination, was asked by the defendants, if, within a week afterwards, he did not tell Kellogg that the skins belonged to Holcomb; but, on the plaintiff's objection, the judge excluded the testimony.

The plaintiff testified that at the time of the attachment the original indebtedness of Holcomb to him had not diminished, but on the contrary had largely increased during the continuance of the contract; and contended that he, and not Holcomb, was the owner of these skins.

On the question of the value of the skins attached, it appeared that the price originally paid by Holcomb for the lot of one thousand was one dollar and ninety cents apiece; and he testified that at the time of the attachment they had no market value in their incomplete condition, but afterwards testified that they were worth at that time eight dollars and fifty cents each. Being then asked by the plaintiff how much it would have cost to complete them, he was permitted to testify (the defendants objecting) that it would have cost about fifty cents per skin.

On cross-examination, the plaintiff and Holcomb admitted that no appraisal or schedule of the property on hand under their contract was ever made; and that they could not state the amount of the plaintiff's several advances. They further testified that it was understood, although there was no express agreement to the effect, that Holcomb was to have a living for himself and his family out of the business; and it appeared that he, during the continuance of his successive arrangements with the plaintiff, supported himself, his wife, two daughters, his son Edwin and his wife, and another son, "and also defrayed the expenses of sundry private lawsuits," out of the proceeds of the business. With regard to these expenses of lawsuits they testified that they did not know their amount, nor was it ever ascertained or included in any settlement between them, nor was any account of them ever kept by Holcomb. They further testified that the tanning business had been very profitable since 1861, but that nevertheless the plaintiff had never realized anything from the profits of the business under their contract to apply towards paying off Holcomb's original indebtedness to him; and Holcomb testified, among other things, that he had grown poorer all the time; that he had never told anybody, between the date of the contract and the date of the attachment, that he was a man of property or means; and that he had never gone to one Levi Rice and tried to effect a loan, and produced and shown to Rice a large amount of money, saying that it was his own.

It also appeared upon cross-examination of the plaintiff and Holcomb that, after the first contract was made between them and until the attachment of the property, the work of tanning was performed upon the premises and in the same shop which had been previously occupied by Holcomb; that the premises, including a farm of sixty acres of good land, were under a mortgage to Holcomb's brother-in-law; that Holcomb quitclaimed to him the entire premises during the continuance of the contract; and that the plaintiff, by Holcomb as his agent, then leased the farm and premises, the plaintiff having never seen the lessor, nor ever knowing of the lease till some time after it was

made, when he agreed with Holcomb that the farm should be carried on in the same way as the business provided for in the contract. And the plaintiff further testified that Holcomb had rendered no account of the farm products, and that there was no agreement between them as to the profits, although he supposed that Holcomb should have his living out of the farm ; and Holcomb testified that he could not tell the income of the farm since the lease, and had kept no account of it.

During the cross-examination of Holcomb, after he had said "that he had paid the expenses of lawsuits out of the business carried on for the plaintiff," he was asked, " if he had paid the expenses of other people's suits out of the property claimed to be the plaintiff's ; " but, upon the plaintiff's objection, the judge excluded the testimony.

The defendants called one Willis Dewey as a witness, who testified that he was a constable in Granby, and served a writ on Holcomb by attachment of property in his possession, in 1860 ; and they asked him, among other things, what declarations, if any, Holcomb made, at that time, as to the condition and ownership of the property, and what, if anything, Holcomb then said as to the disposal and transfer of his property in anticipation of the process and for the purpose of preventing attachment of it on that or any other process; but, on the plaintiff's objection, the judge excluded the testimony, and also excluded the answer of the witness to a prior question by the defendants, whether, during the four years previous to the attachment of the skins by Cooley, he had ever heard Holcomb say how much he was worth, and, if so, what he said.

The defendants also called Levi Rice as a witness, and proposed to prove by him that Holcomb came to him in 1861 and tried to effect a loan, to be secured by mortgage on his property, and took out of his pocket at that time several thousand dollars in gold and bank bills, and said that it was his property ; but, on the plaintiff's objection, the judge excluded this testimony also.

Another witness, called by the defendants, was one Dickinson, a son-in-law of Holcomb, whom they asked, what was the style

of living of Holcomb and his family from November 4, 1861, to the date of the attachment; but the plaintiff objected, and this testimony was excluded in like manner.

Various other testimony of similar nature, offered by the defendants, was excluded also by the judge; the plaintiff making no objection, in the above or any other of the instances, to the form of the questions, but only to the character of the evidence as inadmissible, which ground of objection the judge sustained.

The defendants requested the judge to instruct the jury, " 1. that the contract of November 4, 1861, by its terms, vested in Holcomb a title to the property purchased by him, and if not, it at least created an interest in the property attached; 2. that the possession and control of the property by Holcomb, with the consent of the plaintiff, was evidence tending to show that the plaintiff's title to it was colorable and not real ; 3. that the fact that it was understood and agreed by Holcomb and the plaintiff that Holcomb should be allowed to support himself and his family out of the property and business mentioned in the contract furnished evidence of a secret trust inconsistent with the terms of the contract and of itself constituted a fraud ; 4. that the same fact, if not conclusive, is at least *prima facie* evidence of fraud ; 5. that the conduct of the plaintiff and Holcomb in not making annual settlements based on examinations of the property and business, for a period of four years, the omission to keep books exhibiting the receipts and disbursements of their business and its expenses, and the omission to ascertain the amount appropriated by Holcomb for his personal and family expenses, are so contrary to the usual course of dealing as to furnish evidence that the transactions of the plaintiff with Holcomb were fraudulent; 6. that the conduct of the plaintiff, in intrusting to Holcomb large sums of money and the management of them in business at a distance without security, he being a stranger and known to be insolvent, was evidence tending to show fraud ; 7. that the use of the property, with the knowledge and acquiescence of the plaintiff, by Holcomb in his private business and expenses is a badge of fraud ; 8. that any dealings of the plaintiff with Holcomb which were extraordinary

and out of the usual course of business, for the purpose of se-
curing a debt of the plaintiff against Holcomb, he being insol-
vent, were matters of consideration for the jury as tending to
show fraud on the part of the plaintiff; 9. that by the con-
struction of the contract, the property remaining on hand at the
end of each year became the property of Holcomb, and the plain-
tiff had a claim upon Holcomb for the amount advanced with
ten per cent. interest thereon as profits, with a claim also for the
balance of net profits to be applied upon the payment of his
old debt against Holcomb, and with no lien upon the property
inasmuch as the contract was not a mortgage and was not re-
corded ; 10. that if there was any understanding or agreement
between the plaintiff and Holcomb, by which the arrangement
between them in 1859, which was transferred to Holcomb's son
in 1860, and was again renewed in 1861 by the written contract,
and was thereafter annually renewed, was intended as a cover
to enable Holcomb to do business in his own name, and to con-
ceal and prevent his property from attachment by his creditors,
any such arrangement was fraudulent, no matter in what form
it may have been made, and the plaintiff cannot recover for the
property purchased under it, though he may have expended his
money in the purchase of the property attached, and though he
may have lost money in his dealings with Holcomb, and that
if the jury is left in reasonable doubt on the subject, the burden
of proof being on the plaintiff, he cannot recover."

The judge declined to instruct the jury in the form requested ;
but did instruct them, " 1. that the paper of November 4, 1861,
created the relation of principal and agent between the plaintiff
and Holcomb, and not a partnership, and that all the property
employed in the business during the year was the plaintiff's, and
none of it became Holcomb's except upon an adjustment as
provided in the contract ; 2. that the facts referred to in the de-
fendants' prayers for instructions, from the second to the eighth
inclusive, were not conclusive or even *prima facie* evidence of
fraud, but facts to be considered by the jury with the other evi-
dence in the case ; 3. that there was no stipulation in the con-
tract for the support and living of Holcomb and his family

while the work was being carried on, and that this created a secret trust between the plaintiff and Holcomb, but that such secret trust was not a fraud or *prima facie* evidence of fraud, but was a fact to be considered by the jury with the other evidence in the case; 4. that if the property was in fact Holcomb's and the arrangements and contracts between Holcomb and the plaintiff were a mere cover for the purpose of defrauding or delaying the creditors of Holcomb, then the plaintiff could not recover; and that the various matters suggested by the defendants were proper matters for consideration by the jury."

A verdict was returned for the plaintiff for two thousand two hundred and fifty-nine dollars damages; and the defendants alleged exceptions, which were established in this court on petition.

*W. G Bates & M. B. Whitney,* for the defendants.

1. The arrangements of the plaintiff and Holcomb constituted one continuing contract, from 1859 to the end of the last renewal in 1865. *Coburn* v. *Pickering,* 3 N. H. 415.

2. As to the objections made to the admissibility of evidence. The testimony of Wells that the attached skins belonged to Holcomb should have been admitted as tending to contradict his former testimony in chief as to their ownership. 1 Greenl. Ev. § 449. *Rice* v. *New England Insurance Co.* 4 Pick. 439. The testimony of Holcomb as to how much it would cost per skin to complete the skins for market, was incompetent and irrelevant. *Greene* v. *Washburn,* 7 Allen, 390. *Shepard* v. *Ashley,* 10 Allen, 542. The question as to whether he had paid the expenses of other people's suits out of the property claimed to be the plaintiff's was competent. *Marden* v. *Babcock,* 2 Met. 105. The testimony of Dewey, Rice and Dickinson as to the acts and declarations of Holcomb should have been received as competent evidence of his fraudulent design; and this without proof of knowledge of such acts and declarations on the part of Emmons. *Bridge* v. *Eggleston,* 14 Mass. 245. *Foster* v. *Hall,* 12 Pick. 99, 100. *Taylor* v. *Robinson,* 2 Allen, 562. *Tibbals* v. *Jacobs,* 31 Conn. 428, 432. *Selkirk* v. *Cobb,* 13 Gray, 313. *Allen* v. *Wheeler,* 4 Gray, 125. Proof of other fraudulent con-

**veyances** and transfers of property by Holcomb at or prior to the time of the purchase of the property in question was competent. *Foster* v: *Hall, ubi supra.* And in questions of this description a considerable latitude is indulged in the admission of evidence. *Benham* v. *Cary,* 11 Wend. 83. *Cook* v. *Mason,* 5 Allen, 212. His acts and declarations during the continuance of the business, and relating thereto, were competent as part of the *res gestæ.* 1 Stark. Ev. § 28. 1 Greenl. Ev. §§ 108, 109, 113. *Lund* v. *Tyngsborough,* 9 Cush. 36. Evidence of his declarations was competent also as tending to contradict his testimony as to his poverty. *Mc Gough* v. *Wellington,* 4 Allen, 502. 1 Greenl. Ev. § 462. *Gould* v. *Norfolk Lead Co.* 9 Cush. 347. *Tucker* v. *Welsh,* 17 Mass. 160. Evidence as to the style of living of himself and his family during the time they had their living out of the proceeds of the business was competent as tending to prove a secret trust between him and the plaintiff, and the extent of it.

3. As to the defendants' requests for rulings. The first and ninth requests should have been complied with, inasmuch as the contract nowhere provided that the property should be the plaintiff's. Holcomb had, at least, an attachable interest therein, if not the entire property. Parsons on Part. *c.* 6, § 2, and cases cited. The second instruction asked should have been given. The question in dispute being whether or not the whole arrangement was a fraud, the possession and control of the property by Holcomb by consent of the plaintiff, are facts tending to show fraudulent conduct. *Briggs* v. *Parkman,* 2 Met. 258. *Robbins* v. *Parker,* 3 Met. 117. *Marden* v. *Babcock,* 2 Met. 105. *Bartlett* v. *Williams,* 1 Pick. 288. *Badlam* v. *Tucker,* Ib. 389. *Homes* *r.* *Crane,* 2 Pick. 607. *Wheeler* v. *Train,* 3 Pick. 255. *Gould* v. *Ward,* 4 Pick. 104. *Shumway* v. *Rutter,* 7 Pick. 56. *Johnson* v. *Whitwell,* Ib. 71. The facts disclose a secret trust, extending from 1859 to 1865, that Holcomb and his family should be supported out of the business, and inasmuch as that gave him a false credit, the transaction was in law fraudulent, and so the judge should have instructed the jury as requested in the defendants' third prayer. *Twyne's case,* 3 Co. 81. *Gooch's case,* 5 Co. 60. Bac. Ab. Fraud, C. *Hills* v. *Eliot,* 12 Mass. **31**

*Robbins* v. *Parker, ubi supra.* *Parkman* v. *Welch,* 19 Pick. 236 *Coburn* v. *Pickering, ubi supra,* and cases cited. *Parker* v. *Pattee,* 4 N. H. 176. *Trask* v. *Bowers,* Ib. 309. *Harris* v. *Sumner,* 2 Pick 136, 137. It was, at least, *prima facie* evidence of fraud. *Coburn* v. *Pickering, ubi supra.* *Oriental Bank* v. *Haskins,* 3 Met. 337. Perhaps the discrepancies in the opinions of the different courts may be explained on the ground that in some cases it is conclusive, and in others only presumptive, or *prima facie* evidence, depending on the nature of the facts in each case. The fifth, sixth, seventh, eighth and tenth prayers should have been granted. *Crowninshield* v. *Kittridge,* 7 Met. 520.

4. As to the instructions given. The judge erred in his first instruction as to the construction of the contract, inasmuch as he assumed the fact in dispute, and assured the jury that it merely created an agency, and that Holcomb could have no interest in the property till the parties should see fit to settle. His second ruling also was erroneous. The defendants did not request him to charge that any of the facts, referred to in their prayers except the fourth, were *prima facie* evidence of fraud, but only evidence tending to show fraud ; but, even if the facts referred to in those prayers were not technically *prima facie* evidence, as the phrase is used in connection with a case, " a *prima facie* case," the judge should have explained his meaning of that expression ; for twelve unlearned men might not see the distinction between facts which are " not even *prima facie* evidence of fraud," and " facts to be considered by the jury, with the other evidence in the case," or, " proper matter for their consideration." *Brooks* v. *Powers,* 15 Mass. 244. 2 Kent Com. (6th ed.) 512, *et seq.* *Farnsworth* v. *Shepard,* 6 Verm. 521. *Wilson* v. *Hooper,* 12 Verm. 653 See also cases cited above concerning the second instruction asked. The last clause of the judge's charge does not cure the errors and omissions named, and especially as referring to the tenth prayer. He had stated to the jury that the property was the plaintiff's ; that Holcomb had no interest in it ; that his use and possession of it, the secret trust, the conduct of the parties referred to in the fifth prayer, the intrusting of money, in large sums, to an insolvent stranger, his use of it in his private busi-

ness with the plaintiff's knowledge, and the extraordinary dealings of the parties, were not even *prima facie* evidence of fraud : and it was only after all this that he said that " if the property was in fact Holcomb's, and the arrangements and contracts between Holcomb and the plaintiff were a mere cover for the purpose of defrauding or delaying the creditors of Holcomb, then the plaintiff could not recover."

*M. P. Knowlton*, for the plaintiff, as to the nature of the contract, argued that it constituted an agency and not a partnership, *Bradley* v. *White*, 10 Met. 304. *Holmes* v. *Old Colony Railroad Co.* 5 Gray, 58. *Denny* v. *Cabot*, 6 Met. 92. *Turner* v. *Bissell*, 14 Pick. 192. Holcomb was not liable for losses, received no share of the profits as profits, but only as a compensation for services, and had no lien upon the property. It could have been sold by the plaintiff or attached by his creditors. That accounts were to be kept and that Holcomb was to do the business, does not control the general provisions of the contract.

As to the objections made to the admissibility of evidence, he argued : The testimony of Wells was introduced without objection to prove notice to the defendants. What he said afterwards was immaterial. As to acts and declarations of Holcomb, they are only binding upon the plaintiff, as a part of the *res gestæ*, while he was in the legitimate transaction of the plaintiff's business. *Cooley* v. *Norton*, 4 Cush. 95. *Woods* v. *Clark*, 24 Pick. 39. *Dorne* v. *Southwork Manufacturing Co.* 11 Cush. 205. Nor are they competent to contradict him except upon some matter in issue ; but all matters upon which the defendants seek to contradict him were drawn out upon cross-examination, and are immaterial. The evidence offered about other people's lawsuits was of an act long after the making of the contract and without claim of knowledge on the part of the plaintiff. *Clarke* v. *Waite*, 12 Mass. 439. What Holcomb was worth was not in issue, nor what he said to Dewey about it ; and Holcomb, having been asked about it on cross-examination, could not be contradicted afterwards. 1 Greenl. Ev. § 449. What Holcomb said to Dewey in 1860 about condition and ownership of property was more than a year before the making

of the contract, and it does not appear that the plaintiff ever had
any connection with that property.   The exceptions do not show
that Holcomb's alleged transaction with Rice was nearer than
ten months to the time of his contract with the plaintiff.   It
was not connected in any way with that contract, and Holcomb's
reply about it, on cross-examination, is conclusive.   The style
of living of Holcomb was of no consequence.   The question
to Dickinson was too indefinite and remote.   It does not ap-
pear that the witness knew anything about it.   *Bates* v. *Barber*,
4 Cush. 108.   All the declarations of Holcomb attempted to be
introduced in evidence were of no consequence, whether as direct
evidence or in contradiction, unless they tend to show fraud in
the making of the written contract, for the plaintiff relies for
his title solely upon that and upon the purchase by his check of
these specific skins.

FOSTER, J.*   The learned judge who presided at the trial was,
in the opinion of the court, entirely right in refusing the several
prayers for instructions proffered by the defendants, and the rul-
ings given by him were unobjectionable.   If we were to assume,
which we do not, that the instructions are fully stated in the
exceptions and that they were not so illustrated and applied to
the facts as to guide and assist the deliberations of the jury, they
would certainly be open to the objection of being meagre and
unsatisfactory.   But they are a correct statement of the law,
and appear to have been reported only for the purpose of show-
ing the views upon which the trial proceeded.

The instrument dated November 4, 1861, created between the
plaintiff and Lewis Holcomb the relation of principal and agent
and not a partnership.   All the property acquired under it vested
in the plaintiff, and Holcomb had no interest which could be
attached by his creditors.   This contract is one of a description
not very unfrequent, by which a manufacturer is supplied with
stock and materials which are to continue the property of the
capitalist by whom they are furnished, although it is stipulated

* This case was argued at Boston, January 30–31, 1868, before HOAR, GRAY
FOSTER and WELLS, JJ.

that the party who carries on the business shall ultimately receive any surplus which may remain after reimbursing their cost to the party furnishing them, with interest or a per centage of profit, by way of compensation for his capital. In these arrangements there is nothing illegal or contrary to the policy of the law. The possession of the property by the manufacturer in such a case is not like the continued possession of a vendor after a sale, and cannot be regarded as *prima facie* evidence of fraud in the transaction. *Prima facie* evidence we understand to be evidence which, standing alone and unexplained, would maintain the proposition and warrant the conclusion to support which it is introduced. Certainly the circumstances detailed in the prayers for instructions were not of this character. They were proper to be submitted to the consideration of the jury, and such deductions were to be drawn from them as, in connection with all the other evidence in the case, seemed to the jury natural and proper.

The issue upon trial was whether the arrangement between the plaintiff and Holcomb was what on its face it purported to be, or, as the defendants alleged, a mere cover to delay or defraud the creditors of Holcomb. The burden of proof to maintain this issue of fraud was upon the defendants.

Some of the evidence rejected at the trial seems to us to have been pertinent to maintain this issue and to have been erroneously excluded. Holcomb was himself a witness, and testified that the property attached belonged to the plaintiff. To contradict him it was, of course, competent to prove anything that he had said or done indicating that the property in question or the other property embraced in the agreement of November 4, 1861, and its successive renewals, was really his own, or had been treated or represented by him to be so. The question whether Holcomb had paid the expenses of other people's lawsuits out of ·his property was competent by way of contradiction, as the fact, if proved, had some tendency to show that he had acted as if he himself owned the property which he testified belonged to the plaintiff. The same remarks apply to the testimony as to the style and expense at which Holcomb lived while supported out of the proceeds of this property.

If Holcomb continued to treat and use it as his own, that **fact** tended to contradict his testimony that it belonged to the plaintiff. If he was allowed to do so by the plaintiff, that circumstance was competent on the question whether the arrangement was honest and genuine or fraudulent and nominal only.

In analogy to the rule familiarly applied in the trial of alleged fraudulent conveyances, it was competent to establish the fraudulent purpose of Holcomb in entering into the arrangement with the plaintiff. And as tending to show this, other frauds attempted or perpetrated by him prior to this transaction were admissible in evidence. In this view the statements of Holcomb in 1860, to the constable who then served a writ upon him, as to transfers of property to avoid attachment, should have been admitted.

So also the proposed testimony of Lewis Rice was competent that in 1861 Holcomb, when trying to borrow money on a mortgage, produced from his pocket several thousands of dollars, which he claimed to be his own property. It tended to show a fraudulent purpose on the part of Holcomb, if, prior to the contract with the plaintiff, he was found in possession of large sums of money kept in such a form as not to be attachable by his creditors, and at the same time was engaged in divesting himself of his visible property and was making arrangements to carry on, in the name of another and as agent, the business which he had previously conducted for himself.

The importance and weight of such items of evidence we are not in a position to estimate, but of its admissibility we entertain no doubt. We hardly need to add that fraud on the part of Holcomb would not be alone sufficient; and that the participation of the plaintiff in it was an indispensable part of the defendants' case.

The testimony of Holcomb as to the cost of completing for market the skins attached was properly admitted, upon the question of their value when taken by the defendants.

The question proposed to the witness Wells, whether he had said that the skins belonged to Holcomb, was immaterial. It did not tend to contradict his previous testimony that he noti

fied the defendant Cooley, the attaching officer, that they were the property of the plaintiff.

It appears from the foregoing considerations that a new trial must be granted, and we cannot deem it necessary to extend further an examination of the numerous items of evidence detailed in the bill of exceptions. We have stated the principles which must govern the question of the admissibility of such evidence. It is divided naturally into the two general heads: first, of testimony admissible to contradict other testimony, particularly that of Holcomb; second, of testimony admissible to show the fraudulent character of the arrangement between Holcomb and the plaintiff. Evidence of the latter description relates to the fraudulent purpose of Holcomb, and includes proof of other fraudulent acts by him prior to the transaction under investigation and evidence tending to implicate the plaintiff as a participant in this alleged fraud. A more minute review would be unprofitable, because at another trial many of the questions may arise in a different form and not appear in precisely the same light as on the present report. *Exceptions sustained.*