THE GEORGIA RAILROAD AND BANKING COMPANY *v.* SMITH, Governor.

1. Where the chief pressure of the case was upon the question whether the defendant, in consenting to and authorizing a given contract made with the consignee by the plaintiff in behalf of both carriers for the transportation of certain freights at a special reduced rate, over their respective railways as a connected and continuous line, acted upon information derived from the plaintiff that the contract was, or was to be, limited in its performance to a certain portion of the year, a written request by the defendant to the court to charge the jury in appropriate terms (the same being set out in the request) upon that specific question, should have been complied with. The instruction should have been given in the language requested, or in language substantially equivalent thereto.

2. If the terms of a contract between two railways be agreed upon by correspondence, a limitation or condition inserted in one or more of the communications need not be repeated or referred to in subsequent ones in order to preserve its force.

3. When some of the writings fixing the terms of a contract are lost, testimony as to how the parties themselves interpreted, acted on and treated the contract whilst the business was in progress, may be looked to in connection with other evidence to ascertain its terms and meaning.

4. The declaration being for the recovery of overcharges paid the defendant on shipments to Dalton only, the same should be amended in order to recover for overcharges paid on shipments to Rome also, if both sets of overcharges be embraced in the amount sued for. The *allegata* and *probata* in descriptive matters ought to correspond.

5 The general rule is that on money paid by mistake, where there is no fraud or misconduct by the party receiving it, interest does not run until after demand. Prior to demand by suit or otherwise, the receiver is in no default.

6. *Prima facie* evidence is such evidence as in judgment of law is sufficient, and if not rebutted remains sufficient. It may be rebutted by developing additional facts consistent with its truth, but tending to an opposite conclusion, or by proving it untrue or untrustworthy in whole or in some material part.

7. The books of the Western & Atlantic R. R., though made by statute *prima facie* evidence, may be rebutted or discredited as to particular entries, by internal or external evidence of falsity or error.

November 11, 1889.

Practice. Charge of court. Railroads. Carriers. Contracts. Evidence. Pleadings. Mistake. Interest. Demand. Before Judge MARSHALL J. CLARKE. Fulton superior court. March term, 1889.

Reported in the decision.

HILLYER & BROTHER, for plaintiff in error.

CLIFFORD ANDERSON, attorney-general, and N. J. HAMMOND, *contra*.

BLECKLEY, Chief Justice.

In 1874, the State, as owner of the Western & Atlantic railroad, brought suit in the name of the governor, against the Georgia Railroad & Banking Company, for $3,263.40 principal, besides interest, alleged

overcharges by the latter paid to it by the former on iron consigned to another railroad company, the Selma, Rome & Dalton. All the iron, the subject-matter of the overcharges sued for, was shipped from Charleston; most or all of it to Dalton, the residue if any to Rome, and passed first over the South Carolina, then over the Georgia, and then over the State railroad. So much of it (if any) as went to Rome passed also over the Rome railroad, which connects with the State road at Kingston. The declaration alleges that it all went or was consigned to Dalton, and makes no mention of or reference to Rome or the Rome railroad. The overcharged iron (if indeed any of it was overcharged) was preceded by some which was not overcharged, but was carried at a special reduced rate to which all the carriers concerned assented, the contract with the consignee for that rate being made by the authorities of the State road, but not closed until the other members of the line, or persons authorized to represent them, had been consulted. This contract as finally agreed upon was made in July, 1869, and there is no dispute that iron was carried under it and at a rate conforming to its terms, from August, in which month the transportation began, until the last of November, when shipments ceased until the following January. From January to June, both inclusive, when the transportation of the iron was concluded, all the carriers concerned charged at an increased rate, the increase being caused or at least suggested by a communication by letter or telegram from the State road to the Georgia road, dated in December. The State road credited the Georgia road on its books with the share of the latter road in the freights on all the iron, and the result was that in current settlements, the latter road realized the whole of its share of freights produced by the increased rate. But the consignee refused to pay the State road

for any part of the line at that rate on the iron con-
signed to Dalton, insisting on settling upon the basis
of the low special rate, and to this demand the State
road yielded in November, 1870. Whether the con-
signee took the same stand as to the iron consigned to
Rome, is not quite certain, but if not, and if the in-
creased rate on that part of the iron was paid by the
consignee either to the Rome road or to the State
road, the evidence indicates that the excess over the
low special rate was refunded by the latter road. So
that the whole sum sued for in this action, besides its
own share of the overcharges, was lost to the State
road, either by forbearing to collect any of it from the
consignee, or by so forbearing as to the greater part and
refunding the balance after having collected such bal-
ance. Whether the State can recover the money sued
for from the Georgia Railroad and Banking Company,
to whom it was paid by the State road in current set-
tlements, depends somewhat on several scarcely doubt-
ful questions on which the court charged the jury cor-
rectly, but chiefly on the doubtful question, under the
evidence, whether as between the State road and the
Georgia road the contract of July, 1869, was limited
in the time of performance to the summer months or to
the summer and autumn months of the year in which
it was made, or whether it was without limit as to time
so that it embraced not only the shipments which came
forward from August to November, 1869, but also those
of January and June, and the intervening months of
1870. That the contract actually made with the con-
signee by the State road in behalf of all the carriers
was without any time limit is rendered probable by the
evidence. That the contract bound the Georgia road
relatively to the consignee is also probable, for it is
shown that the agent of the consignee saw at the time
of closing the contract a dispatch from the superintend-

ent of the latter road to an officer or agent of the former saying to close the contract, which dispatch was silent on the element of time, and such a dispatch was in fact sent. The agent had a right to rely, and it may be presumed did rely, upon this dispatch as authority from the Georgia road to the State road to represent it in making such terms as had been agreed upon or were then agreed upon by and between himself in behalf of his principal and the State road in behalf of the whole line, the Georgia road included.

1. It thus appears that in order to reach and decide the merits of the present controversy it is indispensable that it be ascertained whether, assuming the contract with the consignee to have been without a time limit, the State road acted with or without the consent of the Georgia road in omitting to impose that limit. If the State road, in proposing a contract to the Georgia road and inviting its consent thereto, named terms including a time limit, and then closed a contract with the consignee comprehending no such limit, the Georgia road would clearly have the right to stand, relatively to the State road, on the same footing as if the time limit agreed upon between the two roads had been put into the contract made by the State road with the consignee. To meet this aspect of the case, counsel for the Georgia road requested the court to charge the jury (10th ground of the motion for a new trial) as follows: "Even though the jury should find under the evidence that the W. & A. R. R. made the contract alleged and so agreed or promised as to bind itself to transport the 4,300 tons of iron and spikes, without limit in time to the summer and autumn, still, if as between them and the officers of the Georgia Railroad Company the understanding was that the transportation of iron was to take place during the summer and autumn, and the Georgia Railroad Company assented to the rate upon such under-

standing on its part, the plaintiff cannot recover." This request was pertinent and appropriate. It hit the case at the precise point on which the greatest strain of the facts rested. Nor is any adequate substitute for its terms to be found in the charge as given. On the contrary, that charge, in putting the case hypothetically to the jury, dealt only with the contract actually made with the consignee, and not at all with the one which *ought* to have been made as tested by the agreement and understanding between the State road and the Georgia road. The dispatch or dispatches from the former road to the latter, which preceded the responsive dispatch authorizing the contract with the consignee to be closed, are lost. Whether they embraced a time limit is disputed, but there is parol evidence on the subject tending strongly to establish the affirmative. If the truth of the case is correctly rendered by that evidence, the State road, though it may have had authority which bound the Georgia road to the consignee to carry at the reduced rate without regard to time, had no such authority as would create a like obligation as between the two roads. If an agent has private instructions from his principal, and yet violates them in dealing with third persons, the rights of these latter against the principal will not be the measure of the rights of the agent against him in settling up the transaction. The refusal of the court to charge in the language of the request above quoted, or in language substantially equivalent to the same, was error, manifest and material.

2. The request to charge set out in the 18th ground of the motion should also have been acceded to; that is, "if the contract be alleged to have occurred by letter or telegram, and if in any or either of the communications on the subject, the limitation or condition was inserted, it would not be necessary to repeat or again

refer to such condition or limitation in every subsequent letter between the parties in order to preserve its force. If the alleged condition or limitation existed, and was so understood between the parties in point of fact, it should be regarded and enforced as part of the contract, whether again repeated or alluded to in other or subsequent letters or telegrams or not." Several telegrams and one or more letters touching the contract in question, were sent by the superintendent of the Georgia railroad which were silent as to any time element. One of these was the telegram above referred to, giving authority and instructions to close the contract. The silence of all of these documents upon the element of time is strongly suggestive of the theory that in the contemplation of the writer, time was not of the essence of the agreement between the two roads; yet it is true, as the request to charge lays it down, that if in any or either of the communications on the subject a limitation or condition was inserted, it would not be necessary to repeat or again refer to such limitation or condition in every subsequent letter between the parties in order to preserve its force. Thus, if in the lost telegrams, or any of them, from the State road to the Georgia road the condition or limitation was inserted, and in point of fact the authorities of the two roads understood the limitation or condition as forming a part of the contemplated contract, the silence of any or all the subsequent communications on the subject would not displace or defeat the time element; in other words, the silence of the subsequent communications could be regarded by the jury as tending to show what sort of a contract the Georgia road authorized the State road to make in its behalf, but the jury could not rightfully treat such silence as defeating the condition or limitation which by an agreement of the two roads was to be part of the terms of the contract

that one of these authorized the other to make with the consignee.

3. Both these roads actually treated the agreement between themselves, and also that made with the consignee, as having expired with the autumn of 1869, or with the month of November in that year. And the suggestion to change from a lower to a higher rate came from the State road. It was in the acting on this suggestion that the alleged overcharges now sought to be recovered were assessed. Both roads assessed at the increased rate for all transportation of the iron effected after November, 1869. On this state of facts, one or more of the material telegrams relative to the contract being lost, the charge requested, as set out in the 19th ground of the motion, should have been given, to wit, that "any testimony as to how the parties themselves interpreted the contract, and how they acted on it and treated it at the time, and whilst the business was in progress, may be looked to along with other evidence to ascertain what the true terms of the contract or contracts were, and what was the true meaning of the same."

4. The 39th ground of the motion complains that a part of the recovery was for overcharges upon iron which went to Rome. Some of the evidence, such as the receipt given by Barney, tends to show that this was true, whilst other parts of the evidence, such as the credit entered on the books of the State road to the Dalton agency under date of December 31st, 1870, would seem to indicate that the Georgia railroad's proportion of the overcharges on iron which went to Dalton was remitted by the State road up to the amount declared for and found by the jury. As the declaration now stands, any recovery had upon it should be limited to overcharges on the Dalton iron, and if overcharges on the Rome iron were also included in the

amount sued for, the declaration should be amended so as to set forth that fact, and so as to make the *allegata* and *probata* correspond.

5. Under the evidence in the record, any allowance of interest prior to demand would be improper. The overcharges complained of, if made wrongfully by the Georgia road, were not only with the consent but at the suggestion of the State road; and so far as appears, the Georgia road was entirely free from any fraud or fault relatively to the State road in making of them and taking credit for them in current settlements. The most that can be said is that these credits were given and taken by mutual mistake, and the general rule touching money paid by mistake is that, prior to demand by suit or otherwise, the recipient is in no default, and therefore is not chargeable with interest. Jacobs *v.* Adams, 1 Dall. 52 ; Simmons *v.* Walter, 1 McCord, 97 ; Brown *v.* Campbell, 1 Serg. & R. 176 ; King *v.* Diehl, 9 *Ib.* 409; 2 Story Contracts (by Bigelow), §1491 ; Sillick *v.* French (notes), 1 Am. L. Cases, 521. See also, for analogous cases, Boston, etc. *v.* Boston, 4 Metc. 181 ; Wood *v.* Gray, 5 B. Mon. 92; Sharp *v.* Pike, *Id.* 155. In *Riggins* v. *Brown*, 12 *Ga.* 271 (h. n. 8), a surety who without knowing it had been discharged by the creditor, and after such discharge had paid the debt, was allowed, in reclaiming the money, to recover interest upon it. There the act of discharge was one in which the surety did not participate, and of which the creditor had knowledge and the surety was ignorant. The creditor could therefore be considered as in fault for receiving the money without making the surety aware that he, the creditor, had done an act which relieved the surety from obligation to pay the debt. We see nothing in the evidence before us to make that case applicable to the present one on the element of interest. Whether, under the evidence in

the record, the demand should be considered as dating with the commencement of the action, or from something done previously thereto, we need not now consider.

6. The court charged the jury (45th ground of the motion for a new trial) that *"prima facie* evidence is that which is to be taken as true until the contrary is shown by other evidence." We think a more accurate definition or description would be that it is such evidence as in judgment of law is sufficient, and if not rebutted, remains sufficient. U. S. *v.* Wiggins, 14 Peters, 334; Lilienthal *v.* U. S., 97 U. S. 268; Emmons *v.* Westfield Bank, 97 Mass. 230; Anderson *v.* The State, 8 Heis. 14. Starkie (1 Stark. Ev. 544) says, *" prima facie* evidence is that which, not being inconsistent with the falsity of the hypothesis, nevertheless raises such a degree of probability in its favor that it must prevail if it be accredited by the jury, unless it be rebutted or the contrary proved."

7. By the code, §976, the books of the W. & A. railroad were made *prima facie* evidence of what they contain pertinent to the points in issue. The contents of some of these books were introduced in evidence by the State on the trial of the present case. Whilst we think they were admissible, notwithstanding the lease of the road made by the State to other parties had taken effect when some of the entries in the books were made, yet considering that the entries were made somewhat irregularly, and after the cessation of active business by the State as a carrier, and that the person or persons who made the entries, or some of them, were not those who had charge of the books when such active business was in progress, the request set out in the 27th ground of the motion should have been given in charge to the jury, namely, that "plaintiff's books were introduced as only *prima facie* evidence, and were

subject to be rebutted either by internal evidence of what the books themselves contained, or by other facts and circumstances. If the jury find that the books were loosely or inaccurately kept, this should be weighed in rebuttal of them. If the jury find that the facts upon which the entries in such books purported to have been made did not justify such entries, the books should be discredited." Perhaps the last sentence is not sufficiently limited to be altogether accurate in expression, because the books should not be discredited though the facts did not justify certain entries, unless the entries in question were material to the merits of the present case. This, however, we think is implied, as that was the class of entries under investigation. The fact that the books were made evidence by the statute, unless they had been declared conclusive evidence, would not hinder them from being rebutted or discredited from internal or external sources.

We have selected from the almost half a hundred grounds in the motion for a new trial all which we deem material to be discussed separately and specifically in this opinion. For various reasons, or rather for numerous reasons, some of them applying to one ground and some to another, we think that between thirty and forty of the grounds are free from error. Indeed, all set forth in the motion may be considered as overruled by us, except those in which we have pointed out error in the foregoing part of this opinion. The movant, however, was entitled to a new trial, and the court erred in not granting the same.    *Judgment reversed.*